**In re:**

**Public Craft Brewing Company LLC,**   Case No.
                                        Chapter 11 (Subchapter V)
**Debtor.**

## DECLARATION OF MICHAEL W. WIMMER IN SUPPORT OF
## THE DEBTOR'S FIRST DAY MOTIONS

I, Michael W. Wimmer, declare under 28 U.S.C. § 1746 that the following is true to the best of my knowledge, information and belief:

1.  I am one of the managers for Public Craft Brewing Company LLC (the "Debtor"). I own approximately 72% of Debtor's equity interest units.

2.  I have personal knowledge of all facts set forth in this declaration. If I were called upon to testify, I could and would testify competently to these facts.

### Background on Business

### Formation, Business and Events Leading to Chapter 11 Filing

3.  The Debtor was formed in 2010 and began operating shortly afterwards. It brews craft beers and sells its products primarily through its taproom.

4.  Initially, the Debtor was a single member Wisconsin limited liability company owned by Matthew J. Geary.

5.  From 2010 through 2019, the Debtor's business operated marginally profitable. Mr. Geary decided that he needed to grow brewing capacity in order to be profitable and looked for a new facility. He decided on one that would be included in a new real estate project in downtown Kenosha being developed by Witico Development Corporation ("Witico").

6. Witico utilized the federal opportunity zone program enacted in 2017 that provided federal tax benefits and federal and State of Wisconsin historic tax credits to develop real estate in downtown Kenosha. Witico formed Historic Barden, LLC to own the developed project. Witico also managed the completed project and collects rent on behalf of Historic Barden.

7. Following the conclusion of the historic tax credit ("HTC") retention period (December 31, 2024), Witico will own 30% of Historic Barden. I owned (and still own) 25% of Witico and was its CEO at the time of the development. Eight other investors participated in the development and upon conclusion of the HTC retention period will own the remaining 70% of Historic Barden. I was one of those investors and will own 12.6% of Historic Barden indirectly through an opportunity zone investment entity in addition to my indirect ownership of Historic Barden through Witico for a total effective ownership of approximately 20%.

8. The Debtor was to be one of the tenants in the developed real estate. Mr. Geary had lined up bank financing with McHenry Savings Bank in McHenry, Illinois ("McHenry Bank") to fund the expansion. Historic Barden and Mr. Geary entered into a lease and development agreement that anticipated the Debtor raising $200,000 of equity.

9. As the development was proceeding, the COVID-19 pandemic hit. At the time, based upon my general discussions with others in the real estate development business, I anticipated that the pandemic would be over in 60 to 90 days and business would return as it was before the pandemic.

10. However, any investor interest to fund the $200,000 equity investment dried up.

11. In order to protect my investment in Witico and Historic Barden, the Michael W. Wimmer and Susan E. Wimmer Revocable Trust (the "Trust") invested $225,000 into the Debtor

in April 2020. It, and by extension me due to being a trustee with my spouse, became the sole manager of the Debtor.

12. The Debtor closed the loan with McHenry Bank for $1 million on May 5, 2020. The loan paid costs, liens and loans to the Wisconsin Women's Business Initiative Corporation. Mr. Geary and I guaranteed the McHenry Bank loan. We both secured our guaranties with mortgages against our residences. I also secured my guaranty with a lien on life insurance having a cash surrender value.

13. I planned to be an investor only and not manage the business. During my career, I had been a CFO of several companies and then went into real estate development.

14. It became clear that Mr. Geary was a knowledgeable brewmaster but lacked the skills to effectively manage the Debtor's overall business. As the Debtor continued experiencing financial distress, I persuaded Kyle Wenzel and Andrew Jacobsen to invest and actively participate in operating the business. Both became managers of the Debtor. Mr. Jacobson had extensive restaurant experience. Mr. Wenzel had extensive brewing experience.

15. After the investments by Mr. Wenzel, Mr. Jacobsen and the Trust, the ownership structure was as follows:

| | |
|---|---|
| The Trust | 49.65517% |
| Mr. Geary | 10.34483% |
| Mr. Wenzel | 20.0% |
| Mr. Jacobsen | 20.0% |

16. All equity owners were managers except Mr. Geary. He continued to be employed and was the face of the business to customers.

3

17. Compounding the problems from the pandemic was the unrest in Kenosha beginning August 2020 that followed the police shooting of Jacob Blake and the various court proceedings that followed. The Kenosha County courthouse is located in downtown Kenosha near the Debtor's business and taproom.

18. During the unrest, riots and court proceedings, businesses in downtown Kenosha, including the Debtor, were occasionally forced to close and suffered severe traffic diminution.

19. I retired and moved to Arizona in May 2022. I became more involved in management of the Debtor shortly before that and have continued to travel back to Wisconsin to help manage the Debtor's business.

20. The Debtor's business has grown. Its gross revenue hit an all-time high in 2023.

21. However, the business struggled to be profitable. In October 2023, I learned that Mr. Jacobsen, the restaurant manager, had misappropriated funds to support his substance abuse and gambling addictions. He had successfully grown and managed the restaurant part of the business.

22. The other members and I tried to work with Mr. Jacobsen and at the same time protect the business. In November 2023, he resigned as a manager and president, but remained as an employee. Mr. Geary became acting president, a manager and once again began managing all operations. Mr. Jacobsen agreed to repay the misappropriated funds. The Debtor instituted safeguards. However, these were not successful, and we learned that he had misappropriated funds afterwards. In February 2024, Mr. Jacobsen agreed to repay the additional amount we agreed had been misappropriated, resigned his employment and surrendered his ownership units for no enumeration. The entire process, spanning from September 2023 through February 2024 was a severe disruption to the Debtor's ongoing operation.

23. The financial issues required the Trust to make loans to the Debtor. As of December 21, 2023, the loans with interest totaled $95,932. I agreed with the other managers to capitalize $45,000 of the loans with 90 new membership units at a value of $500 per unit. This resulted in the Trust's loan balance being $50,932 as of December 31, 2023.

24. On April 12, 2024, I agreed with the other managing members that the remaining debt owed to the Trust by the Debtor could be converted to membership units, effective April 22, 2024, at a rate of $500 per unit. As of April 22, 2024 and afterwards, the units held by each member of the Debtor was as follows:

| Member | Units | Percentage |
|---|---|---|
| The Trust | 416 | 71.97232% |
| Mr. Geary | 75 | 12.97578% |
| Mr. Wenzel | 87 | 15.05190% |
| **Totals** | **578** | **100.0000%** |

## McHenry Bank Transactions

25. In early 2024, the Debtor's financial performance and problems with Mr. Jacobsen caused McHenry Bank to request that its principal balance be paid down in return for certain other loan forbearance or restructure. It requested that I liquidate my life insurance policy with a cash value of approximately $500,000 to apply to the principal balance. The principal balance was then approximately $760,000 without application of cash surrender value of the life insurance proceeds.

26. I decided to purchase the loan from McHenry Bank. On April 23, 2024, McHenry Bank assigned its loan with security interests to the Trust. The Trust became the lender to the

Debtor and holds a first position lien on all the Debtor's assets. The principal balance of the loan is now approximately $753,000.

### Craft Brewing Industry-Wide Issues

27. Initially, the craft brewing industry flourished and grew by double-digit percentages year-over-year. This slowed to single-digits since 2016. In 2020, the industry shrank by 10%. (These figures are according to Forbes Magazine's 7/14/23 issue.) In order to maximize profits, production capacity must be maximized. This is leading to consolidation of craft breweries in the industry. I have concluded that the best way to maximize the Debtor's value and preserve the jobs of the Debtor's loyal employees is to sell its business as a going concern to another business in the craft beer industry.

### The Debtor's Present Profitability

28. The Debtor lost money in January and February 2024, approximately $25,000 and $6,000, respectively. However, the Debtor usually loses money in those months. For 2023, the Debtor lost $220,065 on an operating basis on total revenue of $1,451,450. A copy of the 2023 year end profit and loss statement is attached as Exhibit 1.

29. I anticipate the Debtor to operate profitably or at least breakeven through the fall of 2024. A week-by-week cash flow statement showing the Debtor's cash needs is attached as Exhibit 2. I prepared Exhibit 2 based upon my review of the Debtor's historical financial information and my involvement from being involved with the business for four years. It shows the expenses that need to be paid on a weekly basis along with projected cash receipts. Since this is a projection, the actual expenses will vary somewhat. I think a cushion of 10% of each cost will be sufficient.

6

## The Need for Cash Collateral

30. The Debtor immediately needs the use of cash to operate to avoid immediate and irreparable harm to its business operations. It needs to purchase materials and supplies. It needs to pay its employees. Those needs are summarized on the attached as Exhibit 2.

## The Need to Pay Pre-Petition Compensation

31. The Debtor has 18 employees. I am not an employee. However, Mr. Geary is an employee. None of his relatives nor mine are on the payroll. The next payroll is Friday, May 3, 2024. I will be submitting the payroll to the payroll service on Wednesday, May 1. The payroll service makes the calculations and submits draws on the Debtor's account for taxes, etc. It then prepares checks and sends them to the Debtor. The Debtor will receive them on Friday, May 3. The Debtor will distribute them to employees at the end of the day. All employees receive paper checks. No one is paid electronically.

32. The payroll is one week in arrears, paid every two weeks. This means the May 3 payroll will consist of compensation earned from April 14 to 27. Thirteen of the 14 days of the payroll will have been earned before the Debtor files its chapter 11 case on Friday, April 26. Each payroll will be approximately $18,000 in total, including the Debtor's taxes related to the payroll. The Debtor does not provide benefits, such as health insurance.

33. The payroll accruing before April 27 is approximately $17,000 including tips and related taxes.

34. Mr. Geary will be paid approximately $1,730 (gross). He is a manager and a member.

35. No one person will be paid more than $15,150 for wages, benefits or other compensation that was earned before April 26, 2024.

36. If employees are not timely paid, it will disrupt the business and sow mistrust among employees that the Debtor needs. The value of the Debtor depends upon its ability to continue as a going concern, including the maintenance of its workforce. Without continuing payments to the Debtor's employees, it is unlikely that the workforce would remain in the Debtor's employ, and even if any workforce remained, it is unlikely that they would be highly motivated to provide quality service. In all likelihood, employees would immediately leave the Debtor's employment. Unemployment is low so replacing employees would be difficult and likely at a higher cost. Without its existing workforce, the Debtor would be unable to produce and deliver product to its customers and the damage to the Debtor would be irreparable. There are no practical or legal alternatives to retention of the employees. As a result, the Debtor needs to use the payment of compensation earned before the chapter 11 filing to garner services after the filing from its workforce. Not doing so would substantially jeopardize the value of the business.

37. I anticipate that the Debtor will have access to sufficient funds on hand, from its business operations and proposed debtor-in-possession financing, to pay all compensation earned before the chapter 11 filing as it becomes due in the ordinary course of the Debtor's business.

**Creditor with Liens on Cash Collateral**

38. The Debtor has granted liens in accounts receivable, inventory and all its other assets to one creditor: McHenry Bank. On April 23, 2024, McHenry Bank assigned its entire loan and liens to the Trust. Presently, the Debtor owes the Trust approximately $753,000 that is secured by all the Debtor's assets.

## Assets Securing the Claims of the Trust

39. Below is a summary of the Debtor's assets. The first column is the amount shown on the Debtor's records as of March 31, 2024 except that cash, inventory and accounts receivable are the amounts shown on the Debtor's financial records as of April 24, 2024. While the numbers in the summary below are not precise to the penny, they are materially the same as of April 26, 2024. The second column is a discount percentage to reflect my opinion of the reduction to the value of the asset that a creditor would likely incur if the Debtor ceased operating and the assets were liquidated as a closed business. The last column is my best estimate of the fair market value of the assets listed in a liquidation:

| Description | Book Amount | Discounted Percentage | Estimated Fair Market Value |
|---|---|---|---|
| All Bank Accounts (approximate) | $ 16,522 | 0% | $ 16,522 |
| Accounts Receivable (current) | $ 6,737 | 50% | $ 3,369 |
| Accounts Receivable (Employee Retention Credit) | $ 237,891 | 0% | $ 237,891 |
| Inventory – Raw Materials | $ 11,704 | 50% | $ 5,852 |
| Inventory – Work in Process | $ 4,805 | 50% | $ 2,402 |
| Inventory – Finished Goods (Beer) | $ 13,230 | 10% | $ 11,907 |
| Inventory – Merchandise | $ 2,902 | 25% | $ 2,177 |
| Prepaid Rent | $ 67,480 | 100% | $ 0 |
| Rent Deposit | $ 15,000 | 100% | $ 0 |
| Loan to Member (Geary) | $ 63,175 | 100% | $ 0 |
| Manufacturing Equipment | $ 153,504 | 60% | $ 61,402 |
| Furniture & Fixtures | $ 13,941 | 100% | $ 0 |
| Office Equipment | $ 0 | 100% | $ 0 |
| Leasehold Improvements | $ 101,853 | 100% | $ 0 |
| Intangible Assets | $ 485 | 100% | $ 0 |
| **TOTAL APPROXIMATE ASSETS** | **$ 709,229** | **N/A** | **$ 341,522** |

40. In my opinion, the value of the assets in which the Trust has a lien exceeds the amount of its claim by approximately $411,500.

## Need for Debtor-in-Possession Financing

41. As shown above, the Trust has a lien on all assets of the Debtor's business. I believe that the debt owed to the Trust exceeds the value of the Debtor's assets by approximately $411,500. No other creditor has a lien the debtor's assets except perhaps the landlord with a statutory landlord's lien.

42. Neither the Debtor nor I have been able to identify any financing that the Debtor could obtain strictly on an unsecured basis without providing collateral. I have had to cause the Trust to make equity infusions and lend money because I could not identify anyone under the Debtor's present circumstances to lend money. The only reason that I am causing the Trust to enter into a debtor-in-possession loan is to maximize the value of the Debtor's business and preserve jobs for its loyal employees.

43. The terms of the debtor-in-possession loan are described in the motion seeking approval of it. In summary, it is a revolving line of credit not to exceed $75,000 with interest at 7% per annum. Loans will only be made as needed with principal being repaid as the Debtor is able to do so. The loan will have priority over all administrative expenses.

44. While the weekly cash flow projections, Exhibit 2, show that the Debtor can cash flow its operations, I am concerned that the margin of error is thin and events, such as inclement weather, could reduce the cash flow so that the Debtor could not meet its operational expenses. Having the debtor-in-possession financing will ensure the Debtor continues to meet its operational expenses after the chapter 11 filing.

### Need to Continue Cash Management System and Bank Account

45. The Debtor has an account at Associated Bank, ending in '496, that receives (a) payments from credit cards used by customers, including those in the taproom that provides bar and food services, and (b) payments from 8 wholesale customers that pay via ACH transfer. If the bank account is closed, it will be disruptive to the Debtor's business. Revenue will not be timely received or be significantly delayed.

46. I understand the need to open new debtor-in-possession accounts. However, keeping account '496 open at Associated Bank and then transferring the funds to a debtor-in-possession account to make all disbursements is the easiest and smoothest way to ensure timely receipt of revenue and accurately account for all disbursements after the chapter 11 filing.

### Need to Honor Customer Programs

47. The Debtor operates a taproom, adjacent restaurant, and directly sells kegs and other products to its customers. It issues gift cards for the taproom. It also receives deposits for kegs, pallets, taps and venue use from retail and wholesale customers.

48. Gift cards, deposits and promotions are typical in the craft beer industry. The Debtor has $7,547 of gift cards outstanding as of April 20, 2024. It has keg and pallet deposits of $11,716 and $267, respectively. It also holds venue deposits of $1,244. Typically, deposits are returned and then immediately received as the kegs and pallets are used again by customers. Venue deposits are held to secure use of the venue and then applied to the rental of the venue. Promotions are accounted for under marketing and no amount is accrued until the promotion is started and the customer invoices the Debtor.

49. In order to continue the Debtor's goodwill with its customers and wholesale customers/distributors and to ensure that customers do not suffer any loss as a result of the

11

chapter 11 filing, it needs to continue to honor gift cards, return deposits and honor promotions through our wholesale customers and distributors in the normal course of the business. It is also crucial for luring new customers and competing in the industry. If the Debtor is unable to continue these programs, it risks alienating customers and could suffer corresponding losses in customer loyalty and goodwill that will harm its prospects for a successful reorganization.

50. Maintaining the customer programs is essential to attracting new customers. Word will get out that customers are not being taken care of by the Debtor. This will put it at a significant competitive disadvantage against competitors. Customer loyalty will erode that could, in turn, adversely affect new customers buying gift cards or purchasing kegs. The Debtor's business will suffer.

### Exit Strategy

51. The Debtor's preliminary chapter 11 exit strategy is to sell the business as a going concern to a successful competitor in the industry. The Debtor does not expect that the sale to exceed the secured debt. It anticipates the sale will have a carve-out to benefit creditors and provide the assumption and assignment of unexpired leases and executory contracts. I am confident that unsecured creditors will realize a greater dividend from the sale than they would if the Debtor's business was shut down.

**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.**

Dated April 26, 2024.     */s/ Michael W. Wimmer*
                                         Michael W. Wimmer

Drafted by:
Jerome R. Kerkman
Kerkman & Dunn
839 N. Jefferson St., Suite 400
Milwaukee, WI 53202-3744
Phone: 414.277.8200
Email: jkerkman@kerkmandunn.com

PUBLIC Craft Brewing Co.
628 58th St
Kenosha, WI 53140

Exhibit 1

## Profit & Loss [With Year to Date]

### December 2023

2/2/2024
07:52:35 AM

| | Selected Period | % of Sales | PUBLIC Master 2023.myo Year to Date | % of YTD Sales |
|---|---|---|---|---|
| Revenue | | | | |
| Taproom Revenue | | | | |
| Taproom Sales | | | | |
| Taproom Beer | $41,462.00 | 35.1% | $424,016.39 | 29.2% |
| Taproom Liquor | $8,002.86 | 6.8% | $83,713.90 | 5.8% |
| Taproom Wine | $1,421.69 | 1.2% | $16,366.64 | 1.1% |
| Taproom NA | $471.70 | 0.4% | $6,532.02 | 0.5% |
| Taproom Merchandise | $76.21 | 0.1% | $14,735.27 | 1.0% |
| Taproom Gaming-ST Exempt | $1,726.00 | 1.5% | $37,838.86 | 2.6% |
| Taproom Packaged Beer | $3,024.20 | 2.6% | $39,807.33 | 2.7% |
| Total Taproom Sales | $56,184.66 | 47.6% | $623,010.41 | 42.9% |
| Total Taproom Revenue | $56,184.66 | 47.6% | $623,010.41 | 42.9% |
| Wholesale Revenue | | | | |
| Wholesale Package Beer Local | $1,198.62 | 1.0% | $46,955.03 | 3.2% |
| Wholesale Keg Beer Local | $1,050.24 | 0.9% | $48,202.24 | 3.3% |
| Wholesale Merchandise Sales | $54.00 | 0.0% | $884.00 | 0.1% |
| Wholesale Package Beer Regionl | $0.00 | 0.0% | $32,719.36 | 2.3% |
| Wholesale Keg Beer Regional | $0.00 | 0.0% | $30,055.00 | 2.1% |
| Wholesale Staffing | $0.00 | 0.0% | $300.00 | 0.0% |
| Total Wholesale Revenue | $2,302.86 | 1.9% | $159,115.63 | 11.0% |
| Restaurant Revenue | | | | |
| Food Sales | $31,308.60 | 26.5% | $420,625.74 | 29.0% |
| Catering Sales | $6,944.55 | 5.9% | $53,515.63 | 3.7% |
| Outside Catering -ST Exempt | $11,449.56 | 9.7% | $53,975.41 | 3.7% |
| Outside Catering WI-ST Non-Ex | $0.00 | 0.0% | $38,807.81 | 2.7% |
| Outside Catering IL-ST Non-Ex | $0.00 | 0.0% | $37,282.52 | 2.6% |
| Third Party Delivery-ST Exempt | $9,961.50 | 8.4% | $61,167.21 | 4.2% |
| Comm Kitchen Svs-ST Exempt | $0.00 | 0.0% | $1,950.00 | 0.1% |
| Total Restaurant Revenue | $59,664.21 | 50.5% | $667,324.32 | 46.0% |
| Miscellaneous Revenue | | | | |
| Sponsorships & Promo Sales | $0.00 | 0.0% | $2,000.00 | 0.1% |
| Total Miscellaneous Revenue | $0.00 | 0.0% | $2,000.00 | 0.1% |
| Total Revenue | $118,151.73 | 100.0% | $1,451,450.36 | 100.0% |
| | | | | |
| COST OF GOODS SOLD (COGS) | | | | |
| Taproom COGS | | | | |
| TR1 COGS | | | | |
| Transfer Cost of Beer TR1 | $0.00 | 0.0% | $79.76 | 0.0% |
| Cost of Guest Beer TR1 | $0.00 | 0.0% | $384.89 | 0.0% |
| Cost of NA Beverages | $79.40 | 0.1% | $10,023.81 | 0.7% |
| Cost of Liquor | $2,858.47 | 2.4% | $32,631.94 | 2.2% |
| Cost of Wine | $0.00 | 0.0% | $4,793.16 | 0.3% |
| Cost of Bar Condiments | $0.00 | 0.0% | $769.64 | 0.1% |
| TR2 COGS | | | | |
| Event Direct Expense TR2 | $0.00 | 0.0% | $1,300.00 | 0.1% |
| Cost of Retail Merchandise | $49.93 | 0.0% | $8,839.02 | 0.6% |
| Inventory Adj (Beer & Merch) | $888.43 | 0.8% | $2,852.35 | 0.2% |
| Brewery COGS | | | | |
| Beer COGS | | | | |
| Purchased Ingredients | $3,531.98 | 3.0% | $112,881.22 | 7.8% |
| Packaging COGS | $0.00 | 0.0% | $450.00 | 0.0% |
| CO2 Expenses | $0.00 | 0.0% | $6,112.33 | 0.4% |
| Excise Tax - State | $27.00 | 0.0% | $803.00 | 0.1% |
| Excise Tax - Fed | $0.00 | 0.0% | $3,022.05 | 0.2% |
| Cost of Wholesale Merchandise | $0.00 | 0.0% | $1,770.49 | 0.1% |
| Inventory Adj (Raw Mat & Beer) | $959.75 | 0.8% | $3,749.19 | 0.3% |
| Waste (Raw Materials & Beer) | $106.48 | 0.1% | $2,601.37 | 0.2% |
| Food COGS | | | | |
| Purchased Food Ingredients | $21,299.31 | 18.0% | $248,884.08 | 17.1% |
| Wages for Production Labor | | | | |
| Production Wages | | | | |
| Brewery Wages | $15,576.96 | 13.2% | $70,438.09 | 4.9% |

| | Selected Period | % of Sales | PUBLIC Master 2023.myo Year to Date | % of YTD Sales |
|---|---:|---:|---:|---:|
| Kitchen Wages | $28,279.72 | 23.9% | $206,967.28 | 14.3% |
| Production Overtime | | | | |
| Brewery Overtime | $0.00 | 0.0% | $1,561.85 | 0.1% |
| Kitchen Overtime | $1,013.54 | 0.9% | $8,941.81 | 0.6% |
| Production P/R Taxes | | | | |
| Brewery P/R Taxes | $831.02 | 0.7% | $11,985.46 | 0.8% |
| Kitchen P/R Taxes | $2,802.07 | 2.4% | $21,350.91 | 1.5% |
| Production Employee Benefits | $0.00 | 0.0% | $2,460.00 | 0.2% |
| Production Workers Comp Ins | $220.83 | 0.2% | $3,339.96 | 0.2% |
| Occupancy COS | | | | |
| Rent Expense Mfg | $4,827.80 | 4.1% | $46,721.68 | 3.2% |
| CAM Expense Mfg | $1,864.24 | 1.6% | $16,886.77 | 1.2% |
| Utilities Mfg | | | | |
| Natural Gas Mfg | $15.60 | 0.0% | $5,513.37 | 0.4% |
| Electricity Mfg | $261.60 | 0.2% | $12,649.38 | 0.9% |
| Sewer & Water Mfg | $619.12 | 0.5% | $3,561.77 | 0.2% |
| Garbage Collection Mfg | $684.03 | 0.6% | $7,850.10 | 0.5% |
| Production Material & Supplies | | | | |
| Brewery Supplies Mfg | $134.16 | 0.1% | $3,609.18 | 0.2% |
| Kitchen Supplies Mfg | $1,584.79 | 1.3% | $20,627.35 | 1.4% |
| Production Equipment | | | | |
| Equip Purchases Mfg | $5,743.00 | 4.9% | $10,811.06 | 0.7% |
| Equip Lease Expense Mfg | $1,434.89 | 1.2% | $11,958.74 | 0.8% |
| Equip Repairs & Maint Mfg | $0.00 | 0.0% | $8,460.49 | 0.6% |
| Equip Depr Mfg | $7,300.55 | 6.2% | $77,217.44 | 5.3% |
| Services COS | | | | |
| Brewery Services COS | $0.00 | 0.0% | $18.00 | 0.0% |
| Freight In | $163.81 | 0.1% | $8,326.40 | 0.6% |
| Kitchen/Restaurant Svcs COS | $168.18 | 0.1% | $10,625.88 | 0.7% |
| **Total COST OF GOODS SOLD (COGS)** | $103,326.66 | 87.5% | $1,013,831.27 | 69.8% |
| **Gross Profit** | $14,825.07 | 12.5% | $437,619.09 | 30.2% |
| Expenses | | | | |
| Selling Expenses | | | | |
| Marketing Expenses | | | | |
| Advertising | $379.64 | 0.3% | $13,968.88 | 1.0% |
| Promo Samples & Materials | $1,312.27 | 1.1% | $9,107.49 | 0.6% |
| Social Media | $0.00 | 0.0% | $5,765.94 | 0.4% |
| Business Development | $0.00 | 0.0% | $1,498.34 | 0.1% |
| Third Party Vendor Commission | $65.36 | 0.1% | $21,816.09 | 1.5% |
| Salaries & Wages SG&A | | | | |
| Officers Comp SG&A | $13,000.00 | 11.0% | $76,807.65 | 5.3% |
| Salaries & Wages Taproom | $12,713.54 | 10.8% | $115,477.10 | 8.0% |
| Salaries & Wages Admin | $4,039.04 | 3.4% | $37,671.69 | 2.6% |
| Salaries & Wages Sales | $0.00 | 0.0% | $26,923.00 | 1.9% |
| Salaries & Wages Marketing | $0.00 | 0.0% | $2,800.00 | 0.2% |
| Overtime Taproom | $0.00 | 0.0% | $1,631.39 | 0.1% |
| P/R Taxes SG&A | $3,219.58 | 2.7% | $37,614.87 | 2.6% |
| Employee Benefits SG&A | $0.00 | 0.0% | $474.50 | 0.0% |
| Workers Comp Ins SG&A | $188.12 | 0.2% | $2,844.29 | 0.2% |
| Educ & Training SG&A | $0.00 | 0.0% | $2,328.65 | 0.2% |
| Commissions Paid | $0.00 | 0.0% | $9,185.14 | 0.6% |
| Taproom Entertainment Expense | | | | |
| Entertainer Expense | $1,000.00 | 0.8% | $33,174.34 | 2.3% |
| T&E Expense | | | | |
| Travel Expense | $1,281.99 | 1.1% | $9,336.62 | 0.6% |
| T&E Meals | $0.00 | 0.0% | $1,197.13 | 0.1% |
| Trade Credit Expense | | | | |
| Merchant Banking Fees | $3,565.57 | 3.0% | $38,961.86 | 2.7% |
| Bad Debt Expense | $13.91 | 0.0% | $1,223.43 | 0.1% |
| Charitable Donations | $0.00 | 0.0% | $717.68 | 0.0% |
| Professional Services SG&A | | | | |
| Accounting Services | $0.00 | 0.0% | $3,876.00 | 0.3% |

PUBLIC Craft Brewing Co.

**Profit & Loss [With Year to Date]**

Exhibit 1

**December 2023**

2/2/2024
07:52:36 AM

PUBLIC Master 2023.myo

| | Selected Period | % of Sales | Year to Date | % of YTD Sales |
|---|---:|---:|---:|---:|
| Consulting Services | $988.21 | 0.8% | $35,810.20 | 2.5% |
| Bank Fees | $0.00 | 0.0% | $484.08 | 0.0% |
| Commercial Insurance SG&A | | | | |
|   General Liability & Umbrella | $549.84 | 0.5% | $6,519.17 | 0.4% |
|   Surety Bonds | $0.00 | 0.0% | $100.00 | 0.0% |
|   Life Insurance | $0.00 | 0.0% | $5,305.18 | 0.4% |
| Car & Truck Expenses | | | | |
|   Fuel Expenses | $0.00 | 0.0% | $2,293.44 | 0.2% |
|   Vehicle Repair & Maintenance | $0.00 | 0.0% | $61.49 | 0.0% |
|   Vehicle Insurance | $0.00 | 0.0% | $1,380.60 | 0.1% |
|   Truck Lease 1 | $0.00 | 0.0% | $4,080.48 | 0.3% |
| Occupancy SG&A | | | | |
|   Rent Expense SG&A | $3,616.21 | 3.1% | $46,555.44 | 3.2% |
|   CAM Expense SG&A | $1,349.96 | 1.1% | $16,378.67 | 1.1% |
|   RE Taxes SG&A | $0.00 | 0.0% | $4,175.71 | 0.3% |
|   Utilities SG&A | | | | |
|     Natural Gas SG&A | $824.86 | 0.7% | $5,846.93 | 0.4% |
|     Electricity SG&A | $1,818.72 | 1.5% | $11,644.28 | 0.8% |
|     Sewer & Water SG&A | $12.64 | 0.0% | $72.69 | 0.0% |
|     Mobile Telephone SG&A | $0.00 | 0.0% | $957.54 | 0.1% |
|     Internet, Landline & TV SG&A | $365.64 | 0.3% | $4,032.23 | 0.3% |
|     Garbage Collection SG&A | $10.90 | 0.0% | $171.82 | 0.0% |
| Materials & Supplies SG&A | | | | |
|   Taproom Supplies SG&A | $372.09 | 0.3% | $6,680.24 | 0.5% |
|   Office Supplies | $326.59 | 0.3% | $1,177.55 | 0.1% |
|   Cleaning Supplies | $665.22 | 0.6% | $9,125.11 | 0.6% |
|   Computer Services & Supplies | $1,599.62 | 1.4% | $10,652.98 | 0.7% |
|   Special Event Supplies | $4,735.76 | 4.0% | $4,735.76 | 0.3% |
| Equipment SG&A | | | | |
|   Equipment Purchases SG&A | $350.00 | 0.3% | $863.84 | 0.1% |
|   Equipment Leases SG&A | $184.63 | 0.2% | $369.26 | 0.0% |
|   Equipment Repairs & Maint SG&A | $0.00 | 0.0% | $280.08 | 0.0% |
|   Equipment Depreciation SG&A | $482.30 | 0.4% | $6,005.80 | 0.4% |
|   Furn & Fixtures Purch SG&A | $0.00 | 0.0% | $3,230.78 | 0.2% |
| Services | | | | |
|   Taproom Services | $0.00 | 0.0% | $1,013.31 | 0.1% |
|   Membership Fees | $25.00 | 0.0% | $713.85 | 0.0% |
|   City/State Licenses & Permits | $0.00 | 0.0% | $4,614.50 | 0.3% |
|   Music Licensing & Oth Svcs | $0.00 | 0.0% | $1,400.68 | 0.1% |
|   Freight Paid | $0.00 | 0.0% | $137.55 | 0.0% |
|   Facility Maintenance | $914.44 | 0.8% | $3,848.23 | 0.3% |
|   Other Services SG&A | $1,689.82 | 1.4% | $2,485.89 | 0.2% |
| Miscellaneous | $0.00 | 0.0% | $76.81 | 0.0% |
| **Total Expenses** | **$61,661.47** | **52.2%** | **$657,684.25** | **45.3%** |
| | | | | |
| **Operating Profit** | **($46,836.40)** | **(39.6%)** | **($220,065.16)** | **(15.2%)** |
| | | | | |
| OTHER INCOME | | | | |
|   Other Income | | | | |
|     Interest Income | $2,100.93 | 1.8% | $2,615.98 | 0.2% |
|     Misc Income | | | | |
|       Sales Tax Discount Taken | $10.00 | 0.0% | $283.74 | 0.0% |
|       Assoc VISA Cash Back | $0.00 | 0.0% | $1,066.11 | 0.1% |
|       Chase VISA Cash Back | $0.00 | 0.0% | $631.44 | 0.0% |
|       Amex Cash Back | $45.30 | 0.0% | $45.30 | 0.0% |
|       Other Misc Income | $181,371.72 | 153.5% | $181,471.72 | 12.5% |
| **Total OTHER INCOME** | **$183,527.95** | **155.3%** | **$186,114.29** | **12.8%** |
| | | | | |
| OTHER EXPENSES | | | | |
|   Interest Expenses | | | | |
|     Interest Expense | | | | |
|       MSB Loan Interest | $2,285.29 | 1.9% | $29,281.12 | 2.0% |
|       Credit Card Interest | $841.65 | 0.7% | $3,085.17 | 0.2% |
|       Other Interest | $0.98 | 0.0% | $20.98 | 0.0% |

**2/2/2024**
**07:52:36 AM**                                                                                  **PUBLIC Master 2023.myo**

|  | Selected Period | % of Sales | Year to Date | % of YTD Sales |
|---|---:|---:|---:|---:|
| Manager Loan Interest | $635.31 | 0.5% | $1,932.29 | 0.1% |
| HYG Fin Services Interest | $0.00 | 0.0% | $172.33 | 0.0% |
| Other Financing Expenses |  |  |  |  |
| Loan Fee Amortization | $37.33 | 0.0% | $447.88 | 0.0% |
| Gain/(Loss) on Disposals | $0.00 | 0.0% | $4,000.00 | 0.3% |
| Total OTHER EXPENSES | $3,803.06 | 3.2% | $39,039.68 | 2.7% |
|  |  |  |  |  |
| Net Profit / (Loss) | $132,888.49 | 112.5% | ($72,990.55) | (5.0%) |

<strong>Exhibit 2</strong>

| | WEEK 1 Week Ending 5/4/2024 | WEEK 2 Week Ending 5/11/2024 | WEEK 3 Week Ending 5/18/2024 | WEEK 4 Week Ending 5/25/2024 | WEEK 5 Week Ending 6/1/2024 |
|---|---:|---:|---:|---:|---:|
| **Cash on Hand (beginning of week)** | $ 18,000 | $ 7,820 | $ 20,835 | $ 10,215 | $ 20,425 |
| **Cash Inflow** | | | | | |
|     Heartland Credit Card Sales | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
|     Taproom Cash Sales | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
|     Outside Catering Sales | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
|     Food Delivery Sales | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
|     Distribution Sales | | | 3,000 | | |
|     DIP Loan Proceeds | | | | | |
| **Total Cash Inflow** | $ 24,500 | $ 27,500 | $ 24,500 | $ 24,500 | $ 24,500 |
| **Cash Outflow** | | | | | |
| Taproom COGS: | 600 | 600 | 600 | 600 | 600 |
| Brewery COGS: | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| Restaurant COGS | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 |
| Taxes (Sales & Excise): | | | | | |
|     WI State Excise Tax | - | - | - | 35 | - |
|     WI State Sales Tax | - | - | - | 4,750 | - |
|     Federal Excise Tax | - | - | - | - | - |
| Heartland Payroll Runs: | | | | | |
|     Salary & Wages (all) | 18,000 | - | 18,000 | - | 18,000 |
|     P/R Taxes (employee & employer) | 6,000 | - | 6,000 | - | 6,000 |
|     3rd Party Checks (garnishments) | 435 | - | 435 | - | 435 |
|     Heartland P/R Services Fee | 295 | - | 295 | - | 295 |
|     Travel & Travel Expense Reimbursement | 200 | 1,400 | 200 | 200 | 200 |
| Restaurant Services | 200 | 200 | 200 | 200 | 200 |
| Equipment Leases & Repairs | 100 | 100 | 100 | 100 | 100 |
| Rent | - | - | - | - | |
| Utilities: | | | | | |
|     Waste Disposal | 750 | - | - | - | - |
|     Sewer & Water | - | - | - | - | - |
|     Electric & Natural Gas (WE Energies) (Deposit) | - | 4,500 | - | - | - |
| Advertising & Marketing | 100 | 100 | 100 | 100 | 100 |
| Material & Supplies: | | | | | |
|     Brewery Supplies (misc) | 100 | 100 | 100 | 100 | 100 |
|     Cleaning Supplies/Paper Products (US Foods) | 200 | 200 | 200 | 200 | 200 |
|     Kitchen Supplies (misc) | 100 | 100 | 100 | 100 | 100 |
|     Office & Misc Supplies | 60 | 60 | 60 | 60 | 60 |
| Freight In Mfg | 100 | 100 | 100 | 100 | 100 |
| Commercial Insurance | - | - | 1,090 | - | - |
| Computer Services & Supplies | 440 | 25 | 540 | 445 | 25 |
| Internet & Landline | | | | 300 | - |
| **Total Cash Outflow** | $ 34,680 | $ 14,485 | $ 35,120 | $ 14,290 | $ 33,515 |
| **Cash on Hand (end of week)** | $ 7,820 | $ 20,835 | $ 10,215 | $ 20,425 | $ 11,410 |